UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

THE BURLINGTON INSURANCE
COMPANY,

        Plaintiff,

        v.

PMI AMERICA, INC., et al.,

        Defendants.

        Case No. 2:08-CV-1054
        JUDGE EDMUND A. SARGUS, JR.
        Magistrate Judge Terence P. Kemp

## OPINION AND ORDER

This matter is before the Court for consideration of the following five motions: (1) Defendant-Counterclaimant, PMI America, Inc.'s ("PMI") Motion for Summary Judgment Against Plaintiff Burlington Insurance Company ("Burlington") (Doc. No. 85), which is hereby **GRANTED**; (2) Plaintiff Burlington's Motion for Partial Summary Judgment Against Defendant Liberty Mutual Insurance Company ("Liberty") (Doc. No. 98), which is hereby **DENIED**; (3) Defendant Carmeuse Lime, Inc.'s ("Carmeuse") Combined Motion for Summary Judgment Against Plaintiff Burlington and Defendant Liberty (Doc. No. 111), which is hereby **GRANTED IN PART AND DENIED IN PART**; (4) Defendant Liberty's Motion for Summary Judgment (Doc. No. 112), which is hereby **DENIED**; and (5) Defendant Liberty's Motion for Leave to File Surreply in Opposition to Plaintiff Burlington's Partial Motion for Summary Judgment (Doc. No. 128), which is hereby **GRANTED**.

## I. BACKGROUND

### A. Facts

The facts set forth in this Opinion and Order are taken from the material in the record

before this Court and from the trial testimony and record before the Pennsylvania state court in

the underlying state court case, discussed *infra*, of which this Court takes judicial notice.

*Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 972 n.5 (6th Cir. 2005) (district court has

discretionary authority to take judicial notice of the record in a state court proceeding).

Defendant Carmeuse owns a facility in Chicago, Illinois, that produces lime and

limestone products using large, rotary kilns.  This case involves Kiln No. 5, which is more than

485 feet long and is comprised of a kiln shell, refractory lining, support tires and rollers, support

piers, a drive gear, and pinions.  The kiln shell is made up of six steel segments that are welded

together.  Kiln No. 5 rests on tires and rollers that are situated on six reinforced concrete piers.

The kiln was installed at a slight slope.  As the kiln rotates, limestone is fed into the high end of

the kiln.  Heat from ignited pulverized coal is continuously introduced from the discharge end of

the kiln.  As the limestone moves down the kiln and is exposed to heat, it is chemically converted

into calcium oxide, *i.e.*, lime.

Carmeuse hired PMI to replace five sections of the kiln shell on Kiln No. 5 during

scheduled kiln outages in 2004 and 2005.  PMI completed its work in July 2005 and Kiln No. 5

was restarted in August 2005.  When Kiln No. 5 was restarted, the tire on pier three immediately

began lifting off of the left support roller, and the tire on pier four began lifting off of the right

support roller, which caused cracked spokes on the tires.  The "lift offs" were caused by an

excessive "dogleg" that was ultimately determined to have been created by PMI's work.

Imperfections in the alignment of kiln shell segments are called doglegs and can, when

sufficiently serious, cause the support tires to lift off their support rollers, which causes structural

stresses and pressure, and lead in turn to damage and excessive wear on the kiln, the gears, and

2

related equipment. PMI representatives inspected Kiln No. 5 in August 2005 and attempted to remedy the dogleg by adjusting the rollers. PMI's adjustments failed to correct the defects.

Carmeuse continued to operate the kiln and in August 2006, the kiln suffered a major crack necessitating a shut-down to make emergency repairs. Carmeuse shut down Kiln No. 5 again in February 2007 in order to have correction cuts performed to remedy the defects in the kiln. In May 2007, Carmeuse again was required to shut down the kiln in order to perform repairs on the bull gear.

## B. State Court Litigation

On February 4, 2008, Carmeuse filed a lawsuit against PMI in the Court of Common Pleas of Allegheny County, Pennsylvania, captioned *Carmeuse Lime, Inc. v. PMI America, Inc.*, GD No. 08-2335, in which it alleged that PMI breached its contractual obligations by failing to properly perform the kiln shell replacement, which caused damage to Kiln No. 5. A trial to the court was held September 2, 2009 through September 10, 2009. On September 15, 2009, the court issued its verdict, finding for Carmeuse in the amount of $978,558.41. The Court also awarded $199,466.40 in delay damages, entered judgment on the verdict on July 10, 2010, and issued its opinion in support of the verdict in October 2010.

PMI appealed the judgment to the Pennsylvania Superior Court. On July 19, 2011, the Superior Court affirmed the $978,558.41 verdict and reversed the award of delay damages. The Superior Court determined that the trial court incorrectly awarded delay damage instead of prejudgment interest. The court remanded to the trial court for a recalculation of interest on the verdict. In accordance with the Superior Court's opinion, the trial court conducted a hearing on August 25, 2011, regarding prejudgment interest. On October 4, 2011, the trial court issued an

3

Order awarding prejudgment interest of 6% on the verdict and amended the judgment to include interest in the amount of $94,746.54. Thus, the total judgment entered in favor of Carmeuse and against PMI was $1,073,304.90.

### C. PMI's Commercial General Liability Policies

PMI and its corporate parent purchased consecutive commercial general liability policies from Plaintiff Burlington and Defendant Liberty. Burlington's policy was effective July 10, 2004, through September 30, 2005 ("Burlington Policy"[1]). Burlington defended PMI in the Pennsylvania state court action. Liberty issued a subsequent commercial general liability policy to PMI and its corporate parent, effective September 30, 2005, through September 30, 2006 ("Liberty Policy"[2]). Both Burlington and Liberty have denied coverage of PMI's claim for indemnification of the judgment entered against it in the Pennsylvania action.

### D. Procedural Posture

On November 6, 2008, Burlington commenced this litigation against Liberty and PMI, seeking a declaration that the Burlington Policy does not cover PMI's loss and for indemnification and contribution from Liberty for the cost of defending PMI in the Pennsylvania action and for any amounts Burlington is found to owe PMI. (Doc. No. 1.) PMI asserted a counterclaim against Burlington and a crossclaim against Liberty seeking declarations that both insurers are contractually obligated to indemnify PMI for the Pennsylvania judgment and pay the cost of defense of PMI in that action. (Doc. No. 15.) In January 2010, this action was stayed

---

[1]All of the language quoted in this Opinion and Order from the Burlington Policy can be found at Document Number 85-2.

[2]All of the language quoted in this Opinion and Order from the Liberty Policy can be found at Document Number 98-3.

4

pending the outcome of the Pennsylvania action. (Doc. No. 52.)

After the stay was lifted, the Court granted Burlington leave to file a second amended complaint, which brought Carmeuse into this litigation. (Doc. No. 65.) Carmeuse has since counterclaimed against Burlington and crossclaimed against Liberty, seeking declarations that both insurers are contractually obligated to indemnify PMI for the Pennsylvania judgment. (Doc. No. 70.)

All of the parties filed numerous motions for extensions of time in which to file their dispositive motions, memoranda in opposition to the dispositive motions, and replies in support of the motions. (Doc. Nos. 86, 93, 96, 101, 103, 107, 114, 115, 118, 121, 125, 133.) For good cause shown, the Court granted those motions. (Doc. Nos. 87, 94, 97, 102, 106, 108, 116, 122, 126, 135.) The dispositive motions briefing is now complete and consists of the following.

On June 7, 2011, Defendant PMI filed it Motion for Summary Judgment. (Doc. No. 85.) On August 23, 2011, Plaintiff Burlington filed its memorandum in opposition (Doc. No. 99), and on October 13, 2011, PMI filed its reply brief (Doc. No. 109).

On August 20, 2011, Plaintiff Burlington filed its Motion for Partial Summary Judgment Against Defendant Liberty. (Doc. No. 98.) On October 31, 2011, Defendant Liberty opposed that motion (Doc. No. 113), on November 28, 2011, Burlington filed its reply in support of its motion (Doc. No. 120), and on November 29, 2011, Burlington filed the Exhibits to its reply brief (Doc. No. 123). On December 21, 2012, Liberty filed a Motion for Leave to File Surreply, to allegedly respond to new arguments Burlington made in its reply brief. (Doc. No. 128.)

On October 19, 2011, Defendant Carmeuse filed its Combined Motion for Summary Judgment Against Plaintiff Burlington and Defendant Liberty. (Doc. No. 111.) On November

5

15, 2011, Liberty filed is memorandum in opposition (Doc. No. 117), and on November 28, 2011, Burlington filed its memorandum in opposition[3] (Doc. No. 119). On December 21, 2011, Carmeuse filed its reply brief. (Doc. No. 131.)

On October 31, 2011, Defendant Liberty filed its Motion for Summary Judgment. (Doc. No. 112.) On December 21, 2011, Plaintiff Burlington filed its memorandum in opposition (Doc. No. 127), Defendant PMI filed its memorandum in opposition (Doc. No. 129), and Defendant Carmeuse filed its memorandum in opposition (Doc. No. 131). On January 23, 2012, Liberty filed its reply brief. (Doc. No. 136.)

## II. SURREPLY

Defendant Liberty filed a Motion for Leave to File a Surreply so that it could address arguments that Plaintiff Burlington purportedly raised for the first time in its reply in support of its motion for partial summary judgment. (Doc. 128.) Burlington did not file a response in opposition to Liberty's motion.

The Local Civil Rules permit the filing of a motion and memorandum in support, a memorandum in opposition, and a reply memorandum. S. D. Ohio Civ. R. 7.2(a)(1), (2). "No additional memoranda beyond those enumerated will be permitted except upon leave of court for good cause shown." S. D. Ohio Civ. R. 7.2(a)(2). Because this Court agrees that Burlington makes new arguments in its reply brief in support of its motion for partial summary judgment,

---

[3]The Court notes that Plaintiff failed to file its memorandum in accordance with this Court's Local Rule 7.2, which requires memoranda that exceed twenty pages to "include a combined table of contents and a succinct, clear and accurate summary, not to exceed five (5) pages, indicating the main sections of the memorandum, the principal arguments and citations to primary authority made in each section, as well as the pages on which each section and any sub-sections may be found." S. D. Ohio Civ. R. 7.2(a)(3).

6

the Court finds good cause for Liberty to file its surreply. *See Tackett v. M&G Polymers USA, LLC*, No. 2:07cv126, 2011 U.S. Dist. LEXIS 30519, at *11-13 (S.D. Ohio Mar. 24, 2011) (granting plaintiffs' motion for leave to file a surreply to address new arguments, cases, and factual assertions presented in defendants' summary judgment reply memorandum). Accordingly, the Court **GRANTS** Defendant Liberty's Motion for Leave to File a Surreply. (Doc. No. 128.)

### III. SUMMARY JUDGMENT

#### A. Standard

Rule 56(a) of the Federal Rules of Civil Procedures provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A court must view the motion in the light most favorable to the nonmoving party, and make all justifiable inference in his favor. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

#### B. Issue Presented

Carmeuse and PMI contend that the Burlington Policy and the Liberty Policy provide coverage for the $1,073,304.90 in damages owed to Carmeuse for the property damage PMI's faulty workmanship caused Carmeuse. The damages awarded by the Pennsylvania court

7

included: recovery for costs of an initial survey and adjustments to rollers following discovery of liftoff; for kiln adjustments; for certain inspection and adjustment work performed by outside contractors; for a kiln cut that partially restored functionality of the kiln; for costs to repair a crack in the kiln shell; and, mechanical components.[4] Burlington and Liberty make various arguments as to why their respective policies do not cover the judgment. Alternatively, Burlington and Liberty argue that, if their respective policies do provide coverage, they are not required to cover the loss because it is specifically excluded under an exclusion provision.

The parties do not dispute that Ohio law provides the controlling legal standards applicable in this case. Ohio law requires that a coverage-defeating argument advanced by an insurer be the only reasonable interpretation of the policy language. *Andersen v. Highland House Co.*, 93 Ohio St. 3d 547, 549 (Ohio 2001) ("[I]n order to defeat coverage, the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question."). If the policy language at issue is susceptible to more than one reasonable interpretation, Ohio courts adopt the interpretation favoring the policyholder. *See King v. Nationwide Ins. Co.*, 35 Ohio St. 3d 208, syllabus (Ohio 1988); *Lane v. Grange Mut. Cos.*, 45 Ohio St. 3d 63, 65 (1989) ("Where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured"). Thus, the construction advanced by Liberty and/or Burlington must be both reasonable and the only reasonable construction of their insuring clauses and/or exclusion provisions.

---

[4]The Pennsylvania court did not award the full amount requested by Carmeuse for the mechanical components because Carmeuse continued to operate the kiln after discovery of the dogleg condition.

8

## C. Coverage Under The Burlington Policy

The Burlington Policy requires Burlington to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The Burlington Policy defines "property damage" to mean "[p]hysical injury to tangible property, including all resulting loss of use of that property." The Policy applies to property damage "only if" it "is caused by an 'occurrence' that . . . occurs during the policy period." An occurrence is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Burlington argues that there was no property damage caused by an occurrence during the policy period because (1) faulty workmanship is not a covered "occurrence," (2) damages from a breach of contract are not covered, and (3) no property damage occurred during the policy period.

### 1. Faulty Workmanship and Collateral Damage

PMI and Carmeuse both argue that an insured's faulty workmanship is itself a covered "occurrence," and that even if it were not, any collateral or consequential damage caused by the faulty workmanship is a covered "occurrence." As to whether faulty workmanship is itself a covered occurrence, Ohio courts are split. Several Ohio courts have held that "an insured's defective workmanship on a construction project constitutes an insurable 'occurrence' under a commercial general liability policy." *See e.g., Dublin Bldg. Sys. v. Selective Ins. Co. of Am.*, 172 Ohio App. 3d 196, 201 (Ohio Ct. App. 2007); *Acme Constr. Co., Inc. v. Continental Nat. Indem. Co.*, No. 81402, 2003 Ohio App. LEXIS 447, ¶¶ 11, 14 (Ohio Ct. App. Jan. 30, 2003); *Ohio Cas. Ins. Co. v. Joseph Sylvester Constr. Co.*, No. 90-T-4439, 1991 Ohio App. LEXIS 4629, at *8 (Ohio Ct. App. Sept. 30, 1991).

9

On the other hand, some Ohio courts have held that "defective workmanship is not an 'occurrence.'" *See e.g., Heile v. Herrmann*, 136 Ohio App. 3d 351, 352 (Ohio Ct. App. 1999); *Acuity v. City Concrete LLC*, 2006 U.S. Dist. LEXIS 79720, *12 (N.D. Ohio Oct. 17, 2006); *Auto Owners Mut. Ins. Co. v. Kendrick*, No. 08-COA-028, 2009 Ohio App. LEXIS 1853 (Ohio Ct. App. May 4, 2009); *Bogner Constr. Co. v. Field & Assocs.*, No. 08 CA 11, 2009 Ohio App. LEXIS 108 (Ohio Ct. App. Jan. 13, 2009). In an apparent attempt to resolve this split of authority, the Ohio Supreme Court recently accepted the following certified question from the Sixth Circuit Court of Appeals: "Are claims of defective construction/workmanship brought by a property owner claims for 'property damage' caused by an 'occurrence' under a commercial general liability policy?" *Westfield Ins. Co. v. Custom Agri Sys., Inc.*, 130 Ohio St. 3d 1415 (2011).

Regardless of the position the Ohio Supreme Court adopts in resolving this split of authority, the damages at issue in this case are the result of a covered occurrence because they are properly categorized as collateral or consequential damages. Even the Ohio courts that have found that faulty workmanship is not a covered occurrence have readily found coverage when there is collateral damage to property other than the insured's work product. These courts explain that an "occurrence" in a commercial general liability policy "will not provide coverage if faulty workmanship is the accident, but will provide coverage if faulty workmanship causes the accident" and there is collateral damage to property other than the insured's work product. *Paramount Parks, Inc. v. Admiral Ins. Co.*, No. CA2007-05-066, 2008 WL 757533; *Heile*, 736 N.E.2d at 568; *see also JTO, Inc. v. State Auto Mut. Ins. Co.*, No. 2010-L-062, 2011 Ohio App. LEXIS 1265 (Ohio Ct. App. March 25, 2011) (finding that water infiltration, which resulted from

defective construction, but which also collaterally damaged walls and ceilings, constituted a covered "occurrence"); *Indiana Ins. Co. v. Alloyd Insulation Co.*, No. 18979, 2002 Ohio App. LEXIS 4052 (Ohio Ct. App. Aug. 2, 2002) (finding that corrosion and related property damage constituted an "occurrence" as consequential damage arising from defective construction of roof because they constituted an accident).

Burlington argues that even though the damages to Kiln No. 5 were not to the sections of the kiln replaced by PMI or the welds made by PMI, the damages are still considered PMI's own work because PMI's work to align the kiln required PMI's "protection of the *entire* kiln." (Doc. No. 99 at 7) (emphasis in original) (relying on *The Cincinnati Insurance Co. v. Dorsey Reconditioning, Inc.*, No. 10-CA-11, 2011 Ohio App. LEXIS 1279 (Ohio Ct. App. March 25, 2011). This Court disagrees.

PMI was contractually required to replace five kiln sections and to align those sections with the existing kiln. The damages to the kiln were not to the five kiln cuts or the welds that were utilized to attach the kiln sections with the existing kiln. Instead, the damages found by the Pennsylvania court were to the support rollers, main gear drive, the east pinion base and one section of the kiln shell on which PMI did not work. The record unequivocally shows that Carmeuse never replaced or repaired any of PMI's five kiln cuts or any of its welds. Carmeuse did not seek nor was it awarded damages for the same.

As PMI correctly argues, Burlington's reliance on *Dorsey Reconditioning* is misplaced. In *Dorsey Reconditioning*, the insured contractor was hired to apply a protective coating to utility poles. The work indisputably concerned the entire utility pole. Here, however, PMI was not hired to work on the entire kiln. Because the damages that resulted from PMI's work were not to

11

any of PMI's work, they are properly considered consequential or collateral damages. Accordingly, the Court finds that the damages suffered by Carmeuse constitute an "occurrence" under the Burlington Policy.

### 2. Breach of Contract

Carmuese's complaint in the Pennsylvania action alleged a breach of contract. The parties agree that the Pennsylvania action complaint should not be construed to encompass only breach of contract. *See Funk v. Rent-All Mart, Inc.*, 91 Ohio St. 3d 78, 80 (2001) (holding that it is the substance of the complaint, not the caption, that determines the nature of the action). Carmuese posits that the nature of the allegations in the Pennsylvania action were for defective workmanship. Burlington, however, contends that this broad interpretation of the nature of a claim only applies in a "duty to defend" analysis and not to a "duty to indemnify" analysis. (Doc. 119 at 11.)

In the latter analysis, Burlington submits that the Court should consider only the liability and damages that the insured, PMI, became legally obligated to pay, which Burlington claims were damages only for a breach of contract. As to breach of contract damages, Burlington argues that they are not covered because a breach of contract is not an "occurrence," which is defined under the policy to mean only "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Burlington asserts that courts that have construed "this language have found that a breach of contract is not an accident since it does not occur by chance or arise from unknown causes." (Doc. No. 119 at 11) (citing to *Weaver v. McGuire*, No. 97CA27, 1997 WL 666169 (Ohio Ct. App. Oct. 24, 1997), unreported,). Further, Burlington argues that to allow damages here would be to treat the Burlington Policy as a

12

performance bond. Burlington's arguments are not well taken.

First, the issue examined by the Ohio courts to determine insurance coverage is not whether the cause of action is one for contract or tort but whether the damages may be characterized as contractual in nature or whether they are consequential property damage. The Northern District of Ohio has explained:

> Claims for economic losses deriving from defective construction sound in contract. These are not the consequential or collateral damages Ohio courts consider covered by [commercial general liability] policies. Ohio courts have found coverage under a [commercial general liability] policy only when defective construction causes damage to other property. *Compare Nat. Eng'g, supra*, 2004 Ohio 2503, 2004 WL 1103993; *Erie Ins. Exch. v. Colony Dev. Corp.*, 136 Ohio App. 3d 419, 736 N.E.2d 950 (2000); and *Acme Steak Co., Inc. v. Great Lakes Mech. Co.*, 2000 Ohio 2566, 2000 WL 1506199, *8 (Ohio App. Ct.) with *Heile*, *supra*, 136 Ohio App. 3d at 354; *Royal Plastics, Inc. v. State Auto. Mut. Ins. Co.*, 99 Ohio App. 3d 221, 650 N.E.2d 180 (1994); *Env. Exploration*, *supra*, 2000 Ohio App. LEXIS 4985, 2000 WL 1608908.

*Younglove Constr., LLC v. PSD Dev., LLC*, 767 F. Supp. 2d 820, 826-27 (N.D. Ohio 2011). The *Younglove* court relied upon *Nat'l Eng'g & Contracting Co. v. U.S. Fidelity & Guar. Co.*, No. 03AP-435 , 2004 WL 1103993, *6 (Ohio App. Ct. 2004), for the proposition that a commercial general liability policy does not cover economic losses because the "policy is simply not a performance bond and is not intended to insure the contractor's work performed or work product." *Younglove Constr.*, 767 F. Supp. 2d at 826 (economic losses described as plant downtime, cost of employees to help repair damage, loss of use, lost profits and replacement costs). Review of the Pennsylvania court's damages award reveals that the only economic damages it awarded were delay damages. The award of those damages, however, was reversed by the Superior Court, which indicated that delay damages are not available as "the damages sought are measurable actual property damage." (Carlin Reply Aff. at Ex. 25, 26.)

Second, the *Weaver* case, the only Ohio case relied upon by Burlington, does not stand

for the proposition that a breach of contract is not an accident entitled to coverage as an

occurrence under a commercial liability policy. Instead, *Weaver* held that intentional fraud,

which did not result in property damage, did not constitute an occurrence.

### 3. Property Damage During the Policy Period

The Burlington Policy was in effect from September 30, 2004 through September 30,

2005. As indicated *supra*, the Burlington Policy applies to property damage "only if" it "is

caused by an 'occurrence' that . . . occurs during the policy period." The Policy defines

"property damage" as:

> a. Physical injury to tangible property, including all resulting
> loss of use of that property. All such loss of use shall be
> deemed to occur at the time of the physical injury that
> caused it; or
>
> b. Loss of use of tangible property that is not physically
> injured. All such loss of use shall be deemed to occur at the
> time of the "occurrence" that caused it.

Burlington argues that "Carmeuse has <u>not</u> established any *specific* liability for 'property

damage' occurring during the [Burlington] 'policy period.'" (Doc. 119 at 12) (emphases in

original). Burlington sets forth three arguments to support its claim.

First, Burlington submits that the Pennsylvania court held that all property damage

occurred after the Burlington Policy had expired. To support this proposition, Burlington

contends that the Pennsylvania court held that PMI breached its contract with Carmeuse on April

24, 2006[5] and that the crack in the kiln shell occurred in August 2006. Because the Burlington

---

[5]PMI and Carmeuse do not agree that the Pennsylvania court held that PMI breached the
contract on April 26, 2006.

14

Policy expired on September 30, 2005, Burlington concludes that neither of these occurrences occurred during the policy period. While the Court agrees that the crack in the kiln shell occurred outside of the policy period, whether the contract was or was not breached on April 24, 2006 does nothing to inform the Court of the date that the damages occurred to the kiln from PMI's faulty work. As the Court explained *supra*, those damages were consequential to the work performed by PMI and some of the damages occurred at the initial restarting of the kiln in August 2005 (during the Burlington Policy period). Those damages included "physical injury to tangible property," *i.e.*, a dogleg, cracked spokes on support rollers, damage to the main gear drive, and damages to the east pinion base.

This finding disposes of Burlington's second argument that no "property damage" occurred during the policy period because prior to the crack in the kiln shell in August 2006, "PMI was held liable for purely economic losses stemming from alignment inspections, and failed attempts to fulfill the alignment provisions of the Contract between PMI and Carmeuse." (Doc. No. 119 at 13.) However, the Pennsylvania court could not have been clearer that the liftoffs that occurred at the restarting of Kiln No. 5 in August 2005 caused a dogleg, damage to the support rollers, the main gear drive, and the east pinion base. In this vein, Burlington claims that even if the "cracked spokes" are covered under its policy, that damage occurred outside of the time period the policy was in effect, which is proven by the "specific evidence regarding the repair of cracked spokes that establishes that it was not until December 21, 2005 that such damage occurred. [citing Ex. C to Doc. No. 119]." The evidence upon which Burlington relies is an invoice indicating when the cracked spokes were *repaired*–not the date the spokes were cracked, which the Pennsylvania court found to be in August 2005.

15

Finally, Burlington argues that it is not responsible for any damage that occurred because "Carmeuse has failed to establish the specific date, amount, and liability finding related to any of these damages." (Doc. No. 119 at 13) (bold and underline emphases omitted). In response, Carmeuse asserts that Burlington "confuses the issue of liability (*i.e.*, is there coverage under the policy for PMI's liability to Carmeuse?) with damages (*i.e.*, how much of PMI's liability to Carmeuse is covered under the policy?). This Court agrees. The fact that discrete factual issues pertinent to the latter may require resolution in future proceedings in no way precludes an affirmative finding on the former.

### 4. Conclusion - Coverage Under the Burlington Policy

The Court concludes that Carmeuse and PMI have shown that the damages to Kiln No. 5 from PMI's work are covered under the Burlington Policy and that at least some of the property damage occurred during the time that the Burlington Policy was in effect

### D. Coverage Under the Liberty Policy

Liberty argues that its policy does not provide coverage for the damages suffered by Carmeuse as a result of PMI's work because (1) there was no "occurrence" during the policy period, (2) any coverage is precluded by the loss in progress doctrine, and (3) any coverage is precluded because PMI did not timely notify Liberty of the loss.

### 1. Occurrence During the Liberty Policy period

The Liberty Policy provides:

> Subject to the applicable Limits of Liability, the Insurer will pay on behalf of the Insured all damages the Insured becomes legally liable to pay by reason of liability imposed by law . . . for: A) bodily injury or property damage covered by this policy and caused by an occurrence which takes place during the policy period.

16

(Doc. # 98 at Ex. C.)  The Policy defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

Liberty argues that there was no "occurrence" during the Liberty Policy period because (a) defective workmanship cannot be an "occurrence," and (b) property damage does not trigger coverage.[6]

### a. Faulty workmanship

Liberty argues that defective workmanship cannot constitute an "occurrence" that would trigger coverage under the Liberty Policy.  For the same reasons this Court rejected Burlington's argument on this issue, it rejects Liberty's.  That is, Liberty is not indemnifying PMI for the faulty workmanship itself, but is indemnifying PMI for the consequential damage to the kiln that was caused by PMI's work.

### b. Property damage trigger

The Liberty Policy, in relevant part, provides:

SECTION I - COVERAGE

Subject to the applicable Limits of Liability, the Insurer will pay on behalf of the "Insured" all damages the "Insured" becomes legally liable to pay by reason of liability imposed by law . . . for:

A.  "bodily injury" or "property damage" covered by this policy and caused by an "occurrence" which takes place during the "policy period";

---

[6]Liberty makes two additional arguments that the Court need not address.  First, Liberty argues that PMI's refusal to repair its defective work is not an "occurrence."  Carmeuse, however, submits that it does not claim that PMI's refusal to repair its defective work is an occurrence.  Second, Liberty contends that a "high stress environment" is not an "occurrence" and that even if it were, Carmeuse should be judicially estopped from making such an argument.  The Court, however, does not rely on Carmeuse's contention that a high stress environment is an occurrence to find that a covered occurrence occurred during the Liberty Policy period.

Liberty argues that, although it "may be undisputed that some property damage occurred during Liberty's policy period [such as] a major crack in the kin shell [that] occurred in August 2006 . . . the existence of property damage during the policy period is not what triggers coverage under the Liberty policy." (Doc. No. 112 at 21.) Liberty supports this proposition with the following argument:

> The Liberty policy is an "occurrence-based" policy that provides coverage based on the time of the "occurrence," not the time of the damage. Section I(A) of the Liberty Policy unambiguously states that coverage extends to:
>
>> "property damage" covered by this policy and *caused by an "occurrence" which takes place during the "policy period."*
>
> (Liberty Policy § I(A) (emphasis added).) While the cracking of the kiln shell in 2006 may constitute "property damage," (see id. § VII(16)), the timing of that damage is irrelevant. In order to trigger coverage under the Liberty policy, the occurrence that caused the property damage had to have taken place during the policy period. Here, it is undisputed that no such occurrence took place during the Liberty policy.

*Id.* In other words, Liberty posits that its policy is triggered only when the occurrence (which causes the property damage) happens during the policy period. In effect, Liberty contends that the phrase "which takes place during the policy period" modifies the word "occurrence" in its insuring agreement rather than the word "property damage."

In response, Carmeuse argues, *inter alia*, that Liberty's interpretation is incorrect, but that even if it were a reasonable interpretation, because it is coverage-defeating, it must be the *only* reasonable interpretation, which it is not. *See, e.g., Andersen v. Highland House Co.*, 93 Ohio St. 3d 547, 549 (Ohio 2001). Carmeuse interprets the language to mean that the policy is triggered by the happening of property damage that took place during the policy period. In effect, Carmeuse asserts that the phrase "which takes place during the policy period" modifies the

18

phrase "property damage" rather than the word "occurrence."

The Court finds both Liberty's interpretation and Carmeuse's are reasonable.  Because the language at issue is susceptible to more than one reasonable interpretation, the Court must adopt the interpretation favoring Carmeuse, the policy holder.

### 2. Loss in Progress[7]

Liberty contends that the loss in progress doctrine precludes coverage and does not trigger Liberty's duty to defend under the Liberty Policy.  Generally, that doctrine embodies "the principle that losses which exist at the time of the insuring agreement, or which are so probable or imminent that there is insufficient 'risk' being transferred between the insured and the insurer, are not proper subjects of insurance."  7 Couch on Insurance § 102.8.  All parties agree that no Ohio court has ever recognized the loss in progress doctrine and both Carmeuse and Burlington highlight that the doctrine has been expressly rejected by two Ohio courts.  Nonetheless, Liberty argues that this Court should apply it to the instant action because the "Sixth Circuit has adopted and applied the loss-in-progress rule under extremely similar circumstances, *see Am. & Foreign Ins. Co., Inc. v. Sequatchie Concrete Servs. Inc.*, 441 F.3d 341 (6th Cir. 2006), and the Ohio Supreme Court would most likely do so as well."  (Doc. No. 136 at 19.)  Liberty's argument is not well taken.

As Burlington correctly points out, the Sixth Circuit applied the doctrine in a case that was based on Tennessee insurance law.  *See Sequatchie Concrete Servs. Inc.*, 441 F.3d at 344 ("This case is governed by Tennessee insurance law [and] [n]o Tennessee case has expressly

---

[7]Burlington also argues that Liberty waived its loss in progress defense, because it did not assert the defense in its answer.  That argument fails for the same reasons Burlington's argument regarding waiver of the late notice defense fails, which the Court discussed *infra*.

spoken on the 'loss-in-progress' doctrine."). Unlike the Tennessee courts, two Ohio courts have

expressly spoken to the loss in progress doctrine. Both courts rejected it.

In a well reasoned opinion, an Ohio court in *Buckeye Ranch, Inc. v. Northfield Ins. Co.*,

declined to adopt the doctrine, explaining that:

> Some decisions also refer to the "known loss" doctrine as the "loss-in-progress"
> rule.
> . . . .
>
> As a threshold issue, courts sometimes wrestle with whether the "known
> loss" doctrine should be recognized as part of the common law in their particular
> jurisdiction. *See, e.g., Peck v. Pub. Serv. Mut. Ins. Co.* (D. Conn. 2005), 363 F.
> Supp.2d 137, 145-146. A common concern is that use of a "known loss" analysis
> may eclipse other insurance doctrines regarding concealment, misrepresentation,
> or damages that are "expected or intended" by an insured. No appellate court in
> Ohio has applied the "known loss" doctrine. Judge Knepper's thoughtful opinion
> in *Owens-Corning Fiberglas v. Am. Centennial Ins. Co.* (1995), 74 Ohio Misc.2d
> 183, 194, 660 N.E.2d 770, declined to introduce the doctrine into Ohio insurance
> law.
> . . . .
>
> [*Physicians Ins. Co. of Ohio v.*] *Swanson*, [58 Ohio St.3d 189 (1991).
> addressed an exclusion from liability coverage for "expected or intended"
> injuries. As recognized in *Owens-Corning Fiberglas supra*, 74 Ohio Misc.2d at
> 194, and in several "known loss" decisions from outside Ohio, the common
> exclusion for "expected or intended" injury is conceptually similar to the "known
> loss" doctrine. *Swanson* quoted a Pennsylvania Supreme Court decision
> observing that "there is a very real distinction between intending an act and
> intending a result and the policy exclusion addresses itself quite clearly to the
> latter." *Id.* at 192. . . . " Many injuries result from intentional acts, although the
> injuries themselves are wholly unintentional." *Id.* This line of reasoning, applied
> to Northfield's endorsement, suggests that it is proper under Ohio law to
> differentiate between an "act" that is "known," and possible "damages arising out
> of any act" for which there is no knowledge. Knowing of one does not mean there
> is knowledge of the other.
>
> The case law on the "known loss" doctrine leads to the same conclusion.
> Awareness by the Ranch of an act that might someday result in "damages" is not
> equivalent to knowledge of damages. *Inland Waters Pollution Control, Inc. v.
> Natl. Union Fire Ins. Co.* (C.A.6, 1993), 997 F.2d 172.

. . . .

> A risk that the incident might produce a claim for damages can now be appreciated in hindsight. However, there is no "known risk" doctrine.

134 Ohio Misc. 2d 10, 23-28 (Fr. Cty. 2005).

This Court agrees with the reasoning of the *Buckeye Ranch* court. Moreover, as Burlington explains, the only appropriate avenue to introduce a loss in progress issue into an insurance dispute is when the policy at issue contains a loss in progress exclusionary endorsement, as did the *Buckeye Ranch* policy. Here, the Liberty Policy does not include such an endorsement and, therefore, it is improper for Liberty to attempt to introduce the doctrine. Thus, this Court will not apply the loss in progress doctrine to prevent coverage here.

### 3. Notice of loss

The Liberty Policy provides:

> In the event of an "occurrence" which may result in a claim under this policy, the "Insured" shall notify the Insurer thereof as soon as possible. Such notice shall contain all reasonably available information pertaining to the "occurrence."

The policy also reserved Liberty's right to investigate any potential claims under the policy and any potential settlement of those claims.

PMI gave Liberty notice of its claim on August 25, 2008. Liberty argues that this notice was unreasonably late. Burlington and Carmeuse disagree and assert that Liberty (a) waived its defense of late notice, but that even if it had not waived it (b) PMI's notice was sufficient to trigger coverage.

### a. Waiver of notice

Both Burlington and Carmeuse argue that Liberty waived its late notice defense.

21

Carmeuse claims that Liberty waived its defense of late notice because it did not assert it in its denial of coverage letter. This Court disagrees. As the Court explains *infra*, in its assessment of the arguments the parties make as to the Liberty Policy exclusions which they claim were waived, Liberty was not required to put this defense in it denial of coverage letter in order to preserve it.

As to Burlington's argument, it submits that Liberty waived its defense of late notice because it did not assert the defense in its answer. Rule 8(c) of the Federal Rules of Civil Procedure required Liberty to "affirmatively state an avoidance or affirmative defense, including . . . waiver." Fed. R. Civ. P. 8(c). In its answer, Liberty does not affirmatively state the defense of untimely notice. Nevertheless, Liberty contends that it has explicitly preserved and has not waived the defense of late notice. This Court agrees.

"It is well established [] that failure to raise an affirmative defense by responsive pleading does not always result in waiver." *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993) (citing federal authorities from multiple jurisdictions); *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997) (court did not abuse discretion by permitting affirmative defenses to be raised for the first time in a second summary judgment motion). If a plaintiff receives notice of an affirmative defense by some means other than pleadings, failure to comply with Rule 8(c) does not cause the plaintiff any prejudice. *Moore*, 992 F.2d at 1445 (citing *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir. 1989)). According to the Supreme Court, the purpose of Rule 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it. *Id.* (citing *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 350 (1971)).

22

Here, Burlington had specific notice in the pleadings themselves that Liberty was

asserting the defenses at issue. Because the defenses implicate facts regarding PMI's (not

Plaintiff Burlington's) failure to comply with the terms of the Liberty Policy and/or PMI's

knowledge of an existing claim at the time it procured the Liberty Policy, Liberty appropriately

raised them in response to PMI's pleadings. In that answer, Liberty stated, *inter alia*:

> Defendant PMI's claims may be barred, in whole or in part, to the extent
> that it failed to provide timely and proper notice of any alleged accident or
> occurrence and/or failed to provide timely and proper notice of any claim
> or suit as required by the LMIC Policy as conditions precedent to coverage.

(Doc. No. 18 at 4.)

Burlington was served with this answer and cannot credibly claim that it lacked

knowledge of the late notice defense or was somehow prejudiced.

### b. Sufficiency of notice

An insured's failure to give its insurer notice in a timely fashion bars coverage because

notice provisions in insurance contracts are conditions precedent to coverage. *Goodyear Tire &

Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St. 3d 512, 517 (2002) (citing *Owens-Corning

Fiberglas Corp. v. Am. Centennial Ins. Co.*, 74 Ohio Misc.2d 183 (Lucas Cty. 1995)). In *Ormet

Primary Aluminum Corp. v. Employers Ins. of Wassau*, 88 Ohio St. 3d 292 (2000), the Ohio

Supreme Court stated: "A provision in an insurance policy requiring notice to the insurer 'as

soon as practicable' requires notice within a reasonable time in light of all the surrounding facts

and circumstances." *Id.* Generally, the question of timeliness calls into play matters to be

discerned by the finder of fact; however, it is also true that "an unexcused significant delay may

be unreasonable as a matter of law." *Id.*

23

In *Ferrando v. Auto-Owners Mut. Ins. Co.*, the Ohio Supreme Court articulated a two-step approach for determining whether a prompt notice provision of an insurance policy was breached, and, if so, whether the breach resulted in prejudice to the extent that the coverage is forfeited:

> The two-step approach in late-notice cases requires that the court first determine whether the insured's notice was timely. This determination is based on asking whether the [] insurer received notice "within a reasonable time in light of all the surrounding facts and circumstances." *Ruby*, [*v. Midwestern Indemn. Co.*, 40 Ohio St. 3d 159, syllabus (1988)]. If the insurer did receive notice within a reasonable time, the notice inquiry is at an end, the notice provision was not breached, and [insurance] coverage is not precluded. If the insurer did not receive reasonable notice, the next step is to inquire whether the insurer was prejudiced. Unreasonable notice gives rise to a presumption of prejudice to the insurer, which the insured bears the burden of presenting evidence to rebut.

98 Ohio St. 3d 186, 208 (2002).

Liberty contends that "PMI clearly knew in August 2005 that there was a problem with the kiln and that its work was responsible for that problem. Yet, PMI did not give notice until three years later. That delay is inexcusable and unreasonable as a matter of law" (Doc. No. 136 at 18.) Carmeuse, Burlington, and PMI do not dispute that PMI was required to give timely notice of the claim to Liberty; however, they claim that PMI's notice was not unreasonable because, *inter alia*, the information and events were unfolding over time.

Burlington persuasively argues that the case *sub judice* is similar to *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St. 3d 512, 517 (2002), wherein the Ohio Supreme Court dealt with an alleged late notice to an insurer. In that case, the court rejected a ten year delay as unreasonable under the circumstances because (1) nothing within the notice indicated how Goodyear was responsible, (2) Goodyear undertook efforts to monitor and correct the issue,

24

and (3) Goodyear continued to disclaim any responsibility for the alleged issue. Here, although it

is undisputed that PMI was made aware of a dogleg condition in August 2005, Burlington argues

that (1) PMI was not informed at that time how it was responsible, (2) PMI undertook efforts to

monitor and correct the alignment issue, and (3) PMI continued to disclaim any responsibility for

the damages. Burlington's arguments are well taken and supported by the evidence before the

Court. Specifically, a March 29, 2006 email from Carmeuse employee Daniel Taylor lends

support to the claim that PMI had not been told exactly what the problem was or how it was

responsible well into the Liberty Policy period (September 30, 2005 through September 30,

2006). In the March 29, 2006 email, Mr. Taylor states:

> We are still retaining $17k from PMI because we are claiming that the
> work they did caused a dogleg in the shell.
>
> In order to continue retaining this money, we must provide a report to
> them defining what is wrong with the kiln, and our explanation regarding why it
> was a result of their work.
>
> It's been SEVEN MONTHS now, and we have provided neither. It is my
> intention to commit to a date to them, and if a report is not provided by that time,
> the 17k will be paid.
>
> Please let me know a specific date for when this information can be made
> available. If a date is not provided to me this week, then I will pick one
> arbitrarily.
>
> I cannot continue to stall PMI indefinitely. . . .  Holding monies with no
> explanation is a poor business practice.

(Doc. No. 123-2 at 4) (emphasis in original).

Further, PMI's witness testified at the Pennsylvania trial that it was April 2006 when it

received the reports from Carmeuse regarding the explanation as to why it attributed the kiln

problems to PMI's work. Moreover, it is clear from the testimony of PMI President Cliff Snyder

25

that PMI denied that it was its work that caused the kiln problems clear up until the Pennsylvania court entered judgment against it.

However, Burlington is mistaken that this evidence leads to the conclusion that the late notice defense is "inapplicable." Instead, as the *Goodyear Tire & Rubber Co.* court explained, the evidence necessitates submission to a jury to determine if the notice was given in a reasonable time. That court specifically stated that it was "not inclined to bypass the factfinder on the question of whether [the insured]'s notice was unreasonably late." 95 Ohio St.3d at 518 ("we find that reasonable minds could come to more than one conclusion as to whether Goodyear's primary and excess insurers received unreasonable notice"). *See also Ormet Primary Aluminum Corp. v. Employers Ins. of Wausau*, 88 Ohio St. 3d 292, 300 (2000) ("the question of whether an insured met the notice condition is usually a question for the jury"). No arguments made by Liberty convince the Court that this matter should be decided as a matter of law, *i.e.*, that the delay was an unexcused significant one.

### 4. Conclusion - Coverage Under the Liberty Policy

The Court concludes that Carmeuse and PMI have shown that the damages fro PMI's work is covered under the Liberty Policy and that at least some of the property damage occurred during the time that the Liberty Policy was in effect. Whether PMI met the notice condition in the Liberty Policy shall be determined by a jury.

### E. Exclusions Under the Burlington Policy and/or the Liberty Policy

Both Liberty and Burlington rely on several exclusions from coverage provisions in their policies that they claim defeat coverage of the judgment against PMI. As a preliminary matter, Carmeuse argues that "Liberty is precluded under Ohio law from asserting its policy based

defenses because it failed to raise them when it denied PMI's claim for coverage in 2008." (Doc.

No. 131 at 18.) Carmeuse asserts that:

> On September 18, 2008, Liberty responded to PMI's notice of loss, stating that the property damage at issue happened before the effective period of the policy. (Sweitzer Decl. Ex. G.) Namely, Liberty stated that the work performed on Kiln No. 5 occurred between March 2004 and July 2005, "at which time start-up of the kiln occurred and problems were identified," but the Liberty policy did not take effect until September 30, 2005. (*Id.*) Liberty concluded, "It is Liberty Mutual's position that the damages [sic: property damage] arose prior to our policy term. . ." (*Id.*) This is the only reason Liberty provided to PMI for its denial of the claim and Liberty made no attempt to reserve its right to assert additional coverage defenses. (*See id.*)

(Doc. No. 111 at 16) (alterations in original). Based on these facts, Carmuese contends that

Liberty should not be permitted to rely on the affirmative defenses it asserted in its answer to

PMI's crossclaim:

> Given the fact that in its September 2008 coverage denial, Liberty failed to reserve its right to supplement its coverage and policy defenses, Liberty should be precluded from "mending its hold" in this litigation to assert these new defenses.
>
> According to the "mend the hold" doctrine, "where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration." In this instance, the Court should apply the "mend the hold" doctrine to prohibit Liberty from introducing new or changed bases for denying insurance coverage to PMI when Liberty explicitly failed to identify them previously and to reserve its right to supplement.

*Id.* at 17 (citations omitted).

Liberty responds that courts have considered, and rejected, use of the "mend the hold"

doctrine in the manner suggested by Carmeuse. Liberty cites as an example *Tobi Engineering,*

*Inc. v. Nationwide Mutual Ins. Co.*, 214 Ill. App. 3d 692, 694 (Ill. App. 1991), in which an

insurer wrote its insured a letter refusing to defend a certain lawsuit and identifying two specific

27

policy exclusions. The insured filed suit and the insurer, Nationwide, set forth additional affirmative defenses. *Id.* The insured argued that Nationwide waived any other defenses except those outlined in the initial correspondence. *Id.* at 696. The court disagreed, noting that "an insurer is not required to assert all of its defenses to liability in a letter to its insured." *Id.* Additionally, the insured "cited no authority for the proposition that Nationwide is restricted to its exclusionary defenses because it initially informed [the insured] that it intended to rely on them and did not reveal . . . an intent to rely on the defense of no coverage." *Id.*

In reply, Carmeuse argues that under Ohio law, an insurance company must assess claims after an "appropriate and careful investigation." (Doc. No. 131 at 18) (citing *Scotts Co. LLC v. Liberty Mut. Ins. Co.*, 606 F. Supp. 2d 722, 738 (S.D. Ohio 2009)). Carmeuse contends that after making this appropriate and careful investigation, Liberty reached a "definitive conclusion" that it owed no coverage to PMI "*solely*" because the property damage sustained by Carmeuse allegedly arose in the prior policy period. (Doc. No. 131 at 18) (emphasis in original). Carmuese concludes: "Having conducted 'an appropriate and careful investigation' in 2008, Liberty must now lie in that bed." (Doc. No. 131 at 18.) While Carmeuse's argument is creative, it does not convince the Court that the mend the hold doctrine is applicable to the instant circumstances.

Liberty points out that Carmeuse has "not cited any case holding that an insurer must list every potentially applicable exclusion in a letter denying coverage or else waive its right to raise those exclusions in subsequent litigation." (Doc. No. 136 at 11.) Nor does this Court find that proposition reasonable. Accordingly, the Court declines to apply the mend the hold doctrine to the instant action and shall permit Liberty to rely upon the affirmative defenses it asserted in its answer.

As to the application of those defenses, "[a]t the outset, it is important to note that '[a]

defense based on an exception or exclusion in an insurance policy is an affirmative one, and the

burden is cast on the insurer to establish it.'" *Continental Ins. Co. v. Louis Marx & Co.*, 64 Ohio

St. 2d 399, 401 (1980) (quoting *Arcos Corp. v.. American Mut. Liability Ins. Co.*, 350 F. Supp.

380, 384 (E.D. Pa. 1972)). The Ohio Supreme Court instructs that, when construing an exclusion

to defeat coverage the insurer must establish that its construction is the only reasonable one. *See*

*Andersen v. Highland House Co.*, 93 Ohio St. 3d at 549.

### 1. Contractual Liability Exclusion

The Burlington Policy provides an exclusion for contractual liability for "'bodily injury'

or 'property damage' for which the insured is obligated to pay damages by reason of the

assumption of liability in a contract or agreement." Burlington posits that, because the

Pennsylvania action was a breach of contract case, the "only possible assumption of liability

arises out of the Contract between PMI and Carmeuse [and is therefore] excluded under the

contractual liability exclusion in the [Burlington] policy." (Doc. 99 at 12.) Carmeuse and PMI

disagree.

Carmeuse contends that "the contractual liability exclusion reaches only a particular type

of contract – a hold harmless or indemnification agreement." (Doc. No. 111 at 10) (citing

numerous cases supporting proposition). In *Commercial Union Ins. Co. v. Basic American*

*Medical, Inc.*, the Northern District of Ohio explained:

> The phrase "liability assumed by the insured under any contract or agreement"
> does not refer to the type of liability incurred as a result of the breach of every
> contract. This phrase refers to a narrower class of contract liability:
>
> > Liability insurance policies not infrequently contain provisions

29

> specifically excluding from coverage liability assumed by the
> insured under a contract not defined in the policy. Such
> provisions, which may be referred to as "contractual exclusion
> clauses," deny the coverage generally assumed by a liability policy
> in cases in which the insured in a contract with a third party agrees
> to save harmless or indemnify such third party.

12 Couch on Insurance § 44A:35 at p. 55 (2nd Ed. 1981). *See also Western Fire
Insurance v. Snyder, Inc.*, 76 Mich. App. 242, 249, 256 N.W.2d 451 (1977). The
purpose of these contractual exclusion clauses is not to make the insurer
underwrite its insureds' contracts, but to limit coverage to the insured's tort
liability. 12 Couch, *supra*, § 44A:36, at p. 57.

703 F. Supp. 629, 633 (N.D. Ohio 1989).

This Court finds the this reasoning sound. At a very minimum, this analysis provides

support for Carmeuse's and PMI's interpretation of the contractual liability exclusion, which

prevents Burlington from establishing that its interpretation is the only one that can fairly be

placed on the language in question. Thus, the Court shall not apply the contractual liability

exclusion to defeat coverage in this instance.

### 2. Impaired Property Exclusion

Both the Liberty Policy and the Burlington Policy contain an impaired property exclusion.

Both policies provide that property is impaired "if such property can be restored to use by the

repair, replacement, adjustment or removal of "the insured's product or the insured's work or by

the insured "fulfilling the terms of the contract or agreement." Both Liberty and Burlington

argue that this exclusion applies here and works to defeat coverage for the judgement against

PMI.

Carmeuse and PMI, however, contend that this exclusion does not apply here. These two

parties submit that Liberty and Burlington cannot meet their burden of showing that Kiln No. 5

30

could be restored to use by the repair, replacement or removal of PMI's work or by PMI's fulfilling the terms of its contract with Carmeuse. This Court agrees.

PMI points out that the record before the Court, derived from the evidence in the trial of the underlying Pennsylvania action, establishes that Kiln No. 5 could not be restored to use by the repair, replacement or removal of PMI's work. In August 2005, when Carmeuse restarted the kiln after PMI completed its work, there was immediate damage to areas of the kiln on which PMI did not work. At that point in time, repair, replacement or removal of PMI's five kiln cuts and its welds would not have restored Kiln No. 5 to its previous condition before PMI worked on it. Interpreting an identical provision, the Fifth Circuit explained:

> [The insured] also argues that the restoration provision of the "impaired property" definition prevents exclusion (m) from applying, and we agree. Specifically, for the exclusion to apply, the complaint must unambiguously state that "impaired property" is susceptible to *full restoration* by repairing, replacing, adjusting, or removing the insured's "work" or the insured's "product." Stated another way, [the insurer] must show that the degradation alleged in [the complaint] would be *entirely repaired* by simply fixing (or removing) the [insured's] unit.

*Martco Ltd. Partnership v. Wellons, Inc.*, 588 F.3d 864 (5th Cir. 2009) (emphases added). This Court too has similarly interpreted an impaired property exclusion. *See also Hartzell Indus. v. Federal Ins. Co.*, 168 F. Supp. 2d 789, 799 (S.D. Ohio 2001) (for proper application of the impaired property exclusion, insurer required to show that the property "could have *regained its full usefulness* if [the insured]'s defective fan had been repaired or replaced") (emphasis added). Interpreting the exclusion similarly here would mean that Burlington and Liberty were required to show that Kiln No. 5 could be entirely repaired by PMI simply fixing or removing its kiln cuts an/or welds. It is uncontroverted, however, that the kiln was damaged in areas outside of those on which PMI worked. Consequently, the kiln would not have been fully repaired or fully

31

restored by PMI repairing, replacing or removing its work.

With regard to whether Kiln No. 5 could be restored to use by PMI's fulfilling the terms of its contract with Carmeuse, PMI asserts that "[t]he record is replete with evidence that the repairs to the Kiln required by the dogleg condition and collateral damages to the Kiln included numerous steps and efforts, none of which were part of the agreement between PMI and Carmeuse." (Doc. No. 129 at 5.) This Court agrees. Neither Burlington nor Liberty have met their burden to show that the kiln could be restored to its pre-August 2005 condition if PMI had returned to Kiln No. 5 and re-welded the kiln shells it had replaced once the entire kiln was misaligned and suffered other damages.

Accordingly, the Court concludes that the property damages awarded in the underlying Pennsylvania action are not excluded from coverage by the impaired property exclusions in the Liberty and Burlington policies.

### 3. Intentional Acts Exclusion

Under the Liberty Policy, the intentional acts exclusion provides that "'bodily injury' or 'property damage' which results from an act that is intended by the 'Insured' or can be expected from the standpoint of a reasonable person to cause 'bodily injury' or 'property damage,' even if the injury or damage is of a different degree or type than actually intended or expected." Liberty submits that it is released from any obligation to PMI based on PMI's "intentional act" of failing to repair the defects in the kiln.

In opposition, Carmeuse argues that "[t]he 'act' upon which Liberty relies, however, is not an 'act,' but an omission, *i.e.*, PMI's refusal to perform repairs to the kiln in April 2006. If Liberty wanted this exclusion to cover the intentional omissions of its insureds, Liberty could

(and should) have written that into its policy[,]" which it did not do. The Court finds Carmeuse's interpretation reasonable, and certainly cannot say that Liberty's coverage-defeating construction is the only one that can fairly be placed on the language in question. This is so especially in light of the fact that the intentional act exclusion is commonly used in situations, unlike the instant one, where the allegation is one of an intentional tort. *See e.g., Sanders v. Nationwide Mut. Ins. Co.*, No. 95228, 2011 Ohio App. LEXIS 1658, 2011 WL 1584427 (Ohio App. 8 Dist. 2011) (homeowner was not entitled to coverage under the "intentional act exclusion" where 17 year old son admitted to attempted aggravated arson by setting fire to the home). Thus, the Court concludes that the intentional acts exclusion does not apply here.

### 4. Professional Services Exclusion

The Burlington Policy contains a professional liability exclusion that provides that there is no insurance coverage for "'property damage' . . . arising out of (1) the rendering of; or (2) failure to render any professional services" by or for the insured. Burlington contends that PMI's work on Kiln No. 5 constitutes "professional services" that are excluded from coverage under this exclusion. Burlington relies upon *Gre Ins. Group v. Normandy Pointe Assocs.* for the following proposition:

> Ohio Courts have accepted more than one definition of professional services relating to insurance contracts. "Professional services" has been defined as services requiring advanced knowledge in a field acquired by a prolonged course of study or specialized intellectual instruction. [*Jacob v. Grant Life Choices*] (June 29, 1995), 1995 Ohio App. LEXIS 2760, Franklin Cty. App. No. 94APE10-1436, unreported. Additionally, "professional services" has been defined as services performed by one in the ordinary course of his profession, on behalf of another, pursuant to an agreement, and for which compensation is reasonably expected. [*Kahn v. Cincinnati Ins. Co.*] (February 3, 1984), 1984 Ohio App. LEXIS 9005, Lucas Cty. App. No. L-83-309, unreported.

33

No. 18998, 2002 Ohio App. LEXIS 1018, at *5 (Ohio Ct. App. March 8, 2002).

Carmeuse responds that:

> Although this exclusion was added through a special endorsement, Burlington did not define the term "professional services." (Policy Endorsement GSG-G-015 0100.) Yet when Burlington calculated the premium to charge PMI for its [commercial general liability] coverage, Burlington well understood that PMI's line of business is "Machinery or Equipment Installation – Industrial." (Policy endorsement IFG-I-0152 1100.) If the term is read to encompass PMI's general business operations, *i.e.*, the installation of industrial machinery and equipment, then the exclusion would swallow the coverage. Such a result is widely disfavored.

(Doc. No. 111 at 14.) Carmeues's argument is well taken.

First, because "professional services" is not defined, Ohio law requires that the term to be narrowly construed, so as to preserve coverage for PMI. *Westfield Ins. Co. v. Hunter*, 128 Ohio St. 3d 540, 543 (Ohio 2011) ("Ambiguous provisions in an insurance policy must be construed strictly against the insurer and liberally in favor of the insured. This is particularly true when considering provisions that purport to limit or qualify coverage under the policy."). At a minimum this means that the Court will not interpret one exclusion to swallow all coverage under a commercial liability policy.

Second, courts routinely restrict the professional services exclusion to those activities that require advanced training and learning. As one Ohio court explained,

> Several courts have stated that 'professional services' involves predominately intellectual services as opposed to physical action. A professional act or service is one arising out of a vocation, calling, occupation or employment involving specialized knowledge, labor or skill. It means work requiring knowledge of an advanced type in a field of learning or science customarily acquired by a prolonged course of study or specialized intellectual instruction as distinguished from training in the performance of routine, manual, or physical processes.

*Leighton v. Am. Econ. Ins. Co.*, No. 1997CA0197, 1997 Ohio App. LEXIS 5361, at *8 (Ohio Ct.

App. Nov. 10, 1997).

Here, the failure to align the kiln prior to welding each section lies much closer to the "performance of routine, manual, or physical processes" than to the advanced knowledge "acquired by a prolonged course of study or specialized intellectual instruction." As Carmeuse's expert testified at trial, to align a kiln section, one would input into computer software certain coordinates that the software would then use to calculate whether the kiln is properly aligned. (Sweitzer Decl. Ex. H at 197-99.) The Court agrees with Carmeuse's conclusion that:

> Certainly, the welding and alignment services that PMI promised to provide require a degree of aptitude to perform, but that by no means renders them "professional." Indeed, many jobs require a degree of specialized skill that would not be commonly used by the average person: a plumber must know how to snake a drain and disassemble a disposal; a construction worker must know how to operate heavy machinery and employ specialized safety protocols. But that does not mean that every time someone engages in work beyond the ken of the average lay person, that service necessarily involves "[1] knowledge of an advanced type [2] in a field of learning or science [3] customarily acquired by a prolong[ed] course of study." *Jacob*, 1995 Ohio App. LEXIS 2760 at * 6.

(Doc. No. 131 at 29.) Consequently, the Court finds that the professional services exclusion does not bar coverage in the instant action.

### 5. Damage to Work Exclusion

The Burlington Policy includes a damage to work exclusion, which provides that there is no coverage for "property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard." Burlington asserts that this exclusion applies here to prevent coverage of the damages awarded to Carmeuse for PMI's defective work.

Carmeuse, in response, submits that "Ohio courts recognize that this exclusion only bars coverage for damage to the insured's own product; it does not bar coverage for collateral damage

to other property that may have been affected by the insured's product." (Doc. No. 111 at 12) (citing *Ferro Corp. v. Blaw-Knox Food & Chem. Equip. Co.*, No. 80804, 2002 Ohio App. LEXIS 5475 (Ohio Ct. App. Oct. 10, 2002) (for the proposition that the exclusion does not bar coverage when one defective product sold by the insured causes property damage to a different, related product also sold by the insured)). Carmeuse concludes that, here, PMI's "product" is the five replaced sections of kiln shell and the welds to those sections and that the property damage sustained by Carmeuse was not to any of the five kiln shell sections or welds replaced by PMI, making this exception inapplicable. This Court agrees.

As the Court explained *supra*, that the damages awarded to Carmeuse were to compensate it for the consequential or collateral damage caused by PMI's work, not for the defective work itself. Accordingly, Burlington cannot show that the "damage to work" exclusion applies here.

### 6. Damage to Property Exclusion

Burlington's final exclusion-based argument involves the damage to property exclusion, which excludes coverage for "any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it. . . . [t]his exclusion does not apply to 'property damage' included in the 'products-completed operations hazard." Thus, if the damage fits within this "products-completed operations hazard" exception to the exclusion, it is covered even if it were otherwise excluded. "Products-completed operations hazard" includes all "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except "[w]ork that has not yet been completed or abandoned." Burlington contends that the work at issue here "has not been completed," and therefore, it does not fit into

36

the exception to the exclusion.

Specifically, Burlington contends that, "[a]ccording to the Trial Court Opinion, PMI *never* completed its alignment work and did not abandon its efforts to properly align until April 24, 2006." (Doc. No. 99 at 20) (emphasis in original). This Court disagrees with Burlington's assessment of the Pennsylvania court's finding. That is, the trial court did not find that PMI never completed its alignment work. Instead, the court found that PMI never started any alignment work. Indeed, a main issue before the court was whether or not the contract between PMI and Carmeuse included alignment work, *i.e.*, whether "[a]fter welding, [PMI was required to] perform a kiln alignment to ensure that the run-out at the joints [was] less than 3/8 inch and that there is no crank (dogleg) over the piers." (Doc. No. 85-1 at 5.) PMI asserted that it never agreed to this provision in the contract, which is why it never undertook the alignment work. The trial court disagreed and found that the contract called for alignment work, that PMI had agreed to perform that work, and that PMI breached the contract for failing to provide that work. Thus, considering the findings of the state court, Burlington's interpretation of the phrase "has not yet been completed or abandoned" includes work that has never been undertaken.

Carmeuse, however, interprets the phrase to mean that only work that was started could be completed. As to that work, the Pennsylvania court was clear that "PMI completed its work in July 2005." Even though PMI returned to adjust rollers, the trial court did not consider that to mean that it had not completed its work. The Court finds that Carmeuse's interpretation is a reasonable one. Consequently, the Court concludes that the damages at issue here fit into the exception to the exclusion and are, therefore, not excluded from coverage under the Burlington Policy.

37

**F. Contribution for Defense**

Burlington provided a defense to PMI in the Pennsylvania court action, which cost $537,852.03. Burlington argues that Liberty is obligated to pay its proportional share of the defense costs Burlington incurred. The duty to defend is broader than the duty to indemnify. *Willoughby Hills v. Cincinnati Ins. Co.*, 9 Ohio ST.3d 177 (1984). Consequently, if a jury determines that PMI's notice to Liberty was not unreasonable, then Liberty not only is required to indemnify PMI for the judgment against it but it is also required to pay its share of the cost to defend PMI in the Pennsylvania action.

## IV. CONCLUSION

Based on the foregoing, the Court finds that both the Burlington Policy and the Liberty Policy provide coverage for PMI's claim for indemnification of the judgment entered against it in the Pennsylvania action and for the costs of defense of that action. However, Liberty may not be required to pay its portion of the judgment or the defense costs if a jury finds that PMI did not timely notify Liberty of the claim. The Court will schedule a trial on that issue forthwith. Accordingly, the Court:

(1) **GRANTS** PMI's Motion for Summary Judgment Against Burlington (Doc. No. 85);

(2) **DENIES** Burlington's Motion for Partial Summary Judgment Against Liberty (Doc. No. 98);

(3) **GRANTS IN PART AND DENIES IN PART** Carmeuse's Combined Motion for Summary Judgment Against Burlington and Liberty (Doc. No. 111);

(4) **DENIES** Liberty's Motion for Summary Judgment (Doc. No. 112); and

(5) **GRANTS** Liberty's Motion for Leave to File Surreply in Opposition to Plaintiff

Burlington's Partial Motion for Summary Judgment (Doc. No. 128).

The Clerk is **DIRECTED** to remove these five motions from the Court's pending

motions list.

**IT IS SO ORDERED.**


_____3-23-2012_____                          _____
**DATE**                                        EDMUND A. SARGUS, JR.
                                                **UNITED STATES DISTRICT JUDGE**